IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

MICHAEL LYNN STEWART, #1084888,

        Petitioner,

v.                                 Action No. 2:16cv33

HAROLD W. CLARKE, Director of the
Virginia Department of Corrections,

        Respondent.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

This matter is before the Court on Michael Stewart's ("petitioner's") *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 and the respondent's motion to dismiss. This matter was referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Rules of the United States District Court for the Eastern District of Virginia. For the following reasons, the Court **RECOMMENDS** that respondent's motion to dismiss, ECF No. 8, be **GRANTED**, and the petition for a writ of habeas corpus ("Pet."), ECF No. 1, be **DENIED** as barred by the statute of limitations.

## I.    PROCEDURAL HISTORY

Petitioner is in state custody pursuant to convictions in the Circuit Court of Arlington County, Virginia. Pet. 1. On July 29, 2004, petitioner was found guilty of one count of breaking and entering, two counts of robbery, three counts of attempted robbery, one count of rape, and five counts of using a firearm in the commission of a felony. *Commonwealth v. Stewart*, Nos. CR04-444–55. On October 22, 2004, the Circuit Court sentenced petitioner to serve 59 years in jail.

On March 23, 2005, petitioner filed a direct appeal to the Court of Appeals of Virginia, alleging:

    (A)    the trial court err[ed] when it denied petitioner's request for an evidentiary hearing regarding the alleged rape victim's prior sexual conduct and err[ed] in holding that the evidence was inadmissible;

    (B)    the Commonwealth fail[ed] to establish a prima facie case of rape; and,

    (C)    the trial court err[ed] when it instructed the jury that the mandatory sentence on four (4) of the five (5) firearm charges was five (5) years.

Pet. for Appeal at 2, *Stewart v. Commonwealth*, No. 2789-04-4. The Court of Appeals denied the appeal on July 7, 2005. Petitioner subsequently filed an appeal asserting the same three arguments, which the Supreme Court of Virginia refused on November 18, 2005. *Stewart v. Commonwealth*, No. 051659. Petitioner did not seek habeas relief in state court. Pet. 3.

Over 11 years later, on January 12, 2016, petitioner filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pet. 1. Petitioner alleges he is entitled to relief under 28 U.S.C. § 2254 based on four claims that are summarized below:

    (1)    newly discovered evidence proved petitioner was intentionally framed and actually innocent;

    (2)    counsel was ineffective because he did not introduce or pursue certain areas of evidence that could have proven the innocence of petitioner;

    (3)    petitioner did not receive a fair and impartial trial as a result of the Court's failure to provide an interpreter in the dialect spoken by the victims; and,

    (4)    the Court violated petitioner's Fourth, Fifth, Sixth, and Fourteenth Amendment rights by viewing all evidence in the light most favorable to the Commonwealth.

Pet. 16–17.

On March 24, 2016, respondent filed a Rule 5 answer and motion to dismiss, ECF Nos.7, 8, and petitioner responded to the motion to dismiss on May 2, 2016, ECF No. 15. Accordingly, the petition for a writ of habeas corpus is ripe for consideration.

## II. FACTUAL BACKGROUND

The information set forth below is a summary of the opening statement of petitioner's counsel and the testimony given during petitioner's trial in the Circuit Court for Arlington County, Virginia on July 27 and July 28, 2004. *Commonwealth v. Stewart*, Nos. CR04-444–55.

During opening statements, petitioner's counsel told the jury that the evidence would show that, on January 13, 2004, Teodulo invited petitioner to the apartment where Teodulo lived with the other alleged victims, Regina Cabrera-Lopez ("Regina"), Melvin Sanchez-Lopez ("Melvin"), Filadelfo Mendez-Lopez ("Filadelfo"), and Fabiana Hernandez-Lopez ("Fabiana"). Trial Tr. 76:1–2. After petitioner arrived, counsel indicated that he smoked marijuana with the alleged victims, and watched the movie "Friday." *Id.* 76:7–9. According to counsel, Teodulo asked petitioner if he would like to have sex with Regina, the two men agreed on a sum of $150.00 for sexual intercourse, and Regina and petitioner went to the bedroom together. *Id.* at 76:9–12. Counsel asserted that, when petitioner did not pay, those present in the apartment beat him up, called the police, and fabricated the charges against him. *Id.* at 76:13–18.

Regina and Melvin testified that, on January 13, 2004, they lived in a one-bedroom apartment on North Second Road with Filadelfo, Fabiana, and Teodulo. *Id.* at 100:1–8, 150:16–151:11.[1] During the early morning hours of January 13, 2004, and while he and Regina slept in a closet, *id.* at 101:8–10, 151:1–6, Melvin testified that he was awakened by a "thief" who was

---

[1] Regina, Melvin, Filadelfo, and Fabiana testified that they are Guatemalan and speak Mum, which caused some difficulty with the Spanish interpreter present at the trial. *Id.* at 99:19–22, 100:9–13, 149:21–22, 155:15–22, 239:12–14, 291:7–8.

wearing a handkerchief on his face and holding a revolver, *id.* at 101:16–103:3. Regina testified that Melvin woke her up, and told her about the intruder. *Id.* at 151:18–22. Both Melvin and Regina testified that petitioner threatened them with a gun, and demanded money. *Id.* at 103:2–103:18, 152:11–21. Melvin testified petitioner ordered him to come out of the closet, and to close all of the windows and lock all of the doors. *Id.* at 103:15–16, 104:5–6. After Melvin completed those tasks, petitioner ordered him back into the closet alone, where he remained for 15 minutes, during which time he did not hear any screaming coming from the living room. *Id.* at 104:20–105:1, 105:22–106:8, 115:2–9.

Regina testified that petitioner retrieved a chair from the kitchen and propped it against the closet door. *Id.* at 153:8. With Melvin secured in the closet, petitioner removed Regina's skirt, threw her underwear under the sofa, put on a condom, and engaged in intercourse with her. *Id.* at 154:4–19. Regina testified that she grabbed the gun and threw it, and that petitioner angrily hit her in the face, but did not yell to avoid alerting the police. *Id.* at 164:3–165:13. On cross-examination, counsel attempted to impeach Regina with her testimony during the preliminary hearing that petitioner was screaming at her, but she persisted in testifying petitioner did not make any sound. *Id.* at 166:10–168:8.

Melvin testified that when petitioner released him from the closet, his cell phone rang and petitioner took the cell phone from him. *Id.* at 106:13–16. On cross-examination, Melvin testified that the cell phone, which was charging on a table by the sofa, rang while he was in the closet, and he assumed petitioner took it because it was no longer there when he attempted to retrieve the phone. *Id.* at 117:9–119:5. Counsel asked Melvin if he recalled testifying during the preliminary hearing that petitioner grabbed the phone from Melvin's hand, but Melvin insisted that was not his testimony. *Id.* at 119:6–8.

4

Regina and Melvin testified that petitioner, who was carrying the gun, escorted them to the bedroom, awakened Fabiana, Filadelfo, and Teodulo, and demanded their money. *Id.* at 107:7–108:10, 157:9–15, 158:1–4. Fabiana and Filadelfo also testified that they awoke to find petitioner pointing a gun and demanding their money. *Id.* at 241:3–17, 293:10–17, 294:6–7, 294:13–14. Regina, Melvin, Fabiana, and Filadelfo testified that they did not know petitioner prior to this incident. *Id.* at 104:11–13, 152:1–2, 246:9–12, 297:19–298:1. All four testified that Fabiana had $40.00 in a jacket pocket in the closet, which was given to petitioner. *Id.* at 108:11–20, 158:5–10, 243:4–15, 294:19–22. They also testified that Teodulo, Melvin, and Filadelfo created a diversion and wrested the gun from the petitioner. *Id.* at 109:16–19, 160:1–6, 245:9–14, 295:6–11. Fabiana and Regina then threw chili or hot sauce in petitioner's eyes. *Id.* at 109:20–22, 160:10–14. Thereafter, Fabiana called the police, who responded to the apartment. *Id.* at 110:5–8, 160:8–9, 245:16–22.

Officer Steve Roesler, with the Arlington County Police Department, testified that he was dispatched to an apartment on North Second Road on January 13, 2004 shortly after 4:00 a.m. *Id.* at 79:18–21, 80:15–81:2. The dispatcher indicated there was a person in the apartment armed with a gun, but due to a language barrier with the caller, the dispatcher could not ascertain what was happening in the apartment. *Id.* at 80:22–81:5. When he arrived, Officer Roesler was waived into the apartment by one woman, and he observed another woman upon entry. *Id.* at 85:12–86:6. Both women appeared frightened and frantic, and appeared to be wearing pajamas. *Id.* at 86:12–14, 94:14–22. The women directed Officer Roesler to the back bedroom where he observed three Hispanic males restraining petitioner on the bed. *Id.* at 86:16–18, 90:3–8. On the floor between the bed and the entrance to the room was a toy pistol that looked "like a Wahler." *Id.* at 90:10–14.

Luis Ordonez, an Arlington County police officer who speaks Spanish, also responded to the scene. *Id*. at 220:13–17, 221:9–13. Officer Ordonez noted that the victims looked like they had just gotten out of bed, and were wearing loose fitting pajamas. *Id*. at 221:22–222:4. Officer Ordonez testified that Regina was reluctant to talk to him, and would look to the other victims prior to responding to his questions. *Id*. at 225:12–22. When he questioned Regina alone about what had happened that evening, she told him that she had been raped by the petitioner. *Id*. at 230:8–12. Officer Ordonez testified that he did not smell marijuana in the apartment. *Id*. at 232:2–4.

Tanya Gonser, an Arlington County police officer, testified that when she arrived, two officers were already present, and Officer Roesler was in the process of detaining petitioner. *Id*. at 203:15–21. Officer Gonser testified that the victims appeared extremely frightened and in shock. *Id*. at 203:22, 209:14–20. Officer Gonser testified that she did not smell marijuana in the apartment. *Id*. at 204:14–19. Officer Gonser performed a search of petitioner, finding an empty condom wrapper and two twenty dollar bills in his front left pants pocket, and a Sprint cellular telephone in his rear left pocket. *Id*. at 207:21–208:6. A brief examination revealed that the cell phone's menu screen contained only words in Spanish. *Id*. at 209:8–11. Officer Gonser testified that, before the victims were transported from the apartment to the police station to meet with detectives, they sat in the living room and did not communicate with each other. *Id*. at 210:4–12. She further testified that they were transported in three different police vehicles and placed into separate rooms at the police station to give statements. *Id*. at 210:17–211:12.

Darel Taber, an Arlington County police officer, testified that prior to putting petitioner into the vehicle for transport from the apartment complex, a pat down uncovered rubber bands around the bottom of petitioner's pant cuff. *Id*. at 216:13–16, 217:11–20. When the rubber

6

bands were cut and the officer shook the pant leg, a condom fell out onto the ground.  *Id.* at 217:18–21.

Michael Ravinskas, an Arlington County police officer, responded to the apartment to collect evidence.  *Id.* at 259:5–9, 260:1–6.  Officer Ravinskas testified that he collected the following items from inside the apartment:  petitioner's jacket with a cellular telephone inside, a bandana and a pellet gun from the bedroom, and a pair of women's panties from underneath the sofa in the living room.  *Id.* at 264:3–21, 265:10–14, 267:18–268:11.

Kelly Ledbetter, a forensic scientist with Virginia's Division of Forensic Science, testified regarding the physical evidence recovery kits collected from Regina and petitioner, as well as the used condom recovered from petitioner.  *Id.* at 128:10–13, 133:2–134:3.  She testified that DNA testing linked the condom to both Regina and petitioner.  *Id.* at 138:8–14.

The sexual assault nurse examiner, Diane Burkhart, testified that Regina's injuries were consistent with the timing and allegations of rape.  *Id.* at 332:12–17.  Nurse Burkhart's examination uncovered two injuries, which she characterized as minor to moderate, comprised of an abrasion and bruise on Regina's right breast and an abrasion in her genital area.  *Id.* at 332:3–11, 333:1–7.  Nurse Burkhart also noted that Regina was not wearing any underpants when she came in for the examination.  *Id.* at 334:1–5.  On cross-examination, Nurse Burkhart testified, in accordance with her report, that she could not conclude whether the abrasions supported Regina's allegation of rape.  *Id.* at 340:1–4.

The prosecution called four other detectives with the Arlington County Police Department to testify, respectively, about evidence collection and their interactions with the residents of the apartment.  *Id.* at 284:16–290:5, 300:3–310:7, 310:21–318:9, 343:10–349:2.

The only witness to testify on behalf of the defense was Jorge Pinto. He testified that he knew petitioner from high school, and that on Thanksgiving day in 2003, he went to the victims' apartment with petitioner and watched part of a football game. *Id.* at 367:2–22. Pinto testified that Melvin and Regina introduced themselves to him, and that Melvin spoke to the petitioner in English. *Id.* at 369:4–11.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The petition is barred by AEDPA's one-year statute of limitations. Further, petitioner has failed to show that the actual innocence exception excuses the late filing of his time-barred petition.

### A.    Statute of Limitations

The petition is barred by the statute of limitations. Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), section 2254 petitioners are subject to a one-year statute of limitations. 28 U.S.C. § 2244(d)(1). The relevant sections of the statute provide that the one-year period begins to run from the latest of "the date on which the judgment became final by the conclusion of direct review," 28 U.S.C. § 2244(d)(1)(A), and "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," 28 U.S.C. § 2244(d)(1)(D).

The Supreme Court of Virginia refused petitioner's direct appeal on November 18, 2005. His conviction became final ninety days later, on February 16, 2006, at the expiration of his time to file a petition for certiorari with the United States Supreme Court. *See* 28 U.S.C. § 2244(d)(1)(A); Sup. Ct. R. 13(1) (directing that a notice of appeal must be filed within 90 days after entry of final judgment); *Harris v. Hutchinson*, 209 F.3d 325, 328 n.1 (4th Cir. 2000) (holding that a judgment became final when the 90 day period for filing a petition for certiorari

8

with the United States Supreme Court expired). Petitioner did not file a petition for writ of habeas corpus with the state court. Accordingly, petitioner had until February 16, 2007 to file his habeas petition in this Court. Petitioner did not file his habeas petition with the Court until January 12, 2016, almost nine years outside the one-year statute of limitations prescribed by 28 U.S.C. § 2244(d)(1)(A) of the AEDPA.

Petitioner asserts his petition is based on newly discovered evidence that was not previously available, an affidavit of Bilal Roland dated August 26, 2014. Pet. 14, 37–39. The AEDPA provides for a delayed commencement of the statute of limitations, on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," if this is later than the date the conviction became final. 28 U.S.C. § 2244(d)(1)(D). Assuming the Roland affidavit was new and material, and could not have been discovered until August 26, 2014, which this Court is not persuaded is the case, the federal period of limitations would have run in August 2015, over four months before petitioner filed his federal petition on January 12, 2016. Accordingly, the petition is barred by the statute of limitations even if petitioner is entitled to delayed commencement of the one-year period pursuant to 28 U.S.C. § 2244(d)(1)(D).

## B.    Actual Innocence

To have the merits of his constitutional claims reviewed by this Court, petitioner seeks an equitable exception from the statute of limitations based on a showing of actual innocence. The Supreme Court has recognized that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" to bring claims after the statute of limitations expires. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). This exception to the statute of limitations "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that

no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 133 S. Ct. at 1933 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). More specifically, the exception requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eye witness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. If a petitioner provides the court with reliable, newly discovered evidence, then the court weighs the new evidence in light of the previous admissible and inadmissible evidence and makes a "probabilistic determination about what a reasonable jury would do." *Id.* at 329. The *Schlup* standard is an exceedingly high burden to satisfy and thus only permits review in "extraordinary" cases. *House v. Bell*, 547 U.S. 518, 538 (2006); *see also Schlup*, 513 U.S. at 299. Further, a petitioner's actual innocence claim "'does not by itself provide a basis for relief.'" *Teleguz v. Pearson*, 689 F.3d 322, 328 (4th Cir. 2012) (quoting *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010)). Instead, a petitioner's "claim of innocence is . . . 'a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

Petitioner's newly discovered evidence is the sworn and signed affidavit of Bilal Roland ("Roland"), an inmate at the same correctional institution as petitioner. Pet. Ex. A, ECF No. 1 at 37–39. In the affidavit, Roland claims he was present at the apartment on North Second Road at the time of the incident leading to petitioner's convictions. *Id.* at 37. Roland asserts that, on January 13, 2004, he, his girlfriend Lisa, his friend Daniel Gomez (a member of the MS-13 gang), Melvin, Filadelfo, Teodulo, and two other MS-13 gang members (whose names he did not know), were in the living room of the apartment smoking marijuana and watching the movie "Next Friday." *Id.* He claims that Regina and Fabiana were engaging in prostitution with two male clients in the back bedroom. *Id.* Following a call from Teodulo, petitioner came to the

apartment to sell marijuana, and petitioner gave Fabiana two bags of marijuana for $40.00. *Id.* After the movie ended, petitioner asked Melvin if he could charge his cellphone on Melvin's charger, and Melvin put petitioner's phone on the charger. *Id.*

Roland stated that he paid petitioner $150.00 for a "glove of weed," and that petitioner pulled out "a knot of cash" during the transaction that everyone noticed. *Id.* After this, Regina came out of the bedroom, whispered in petitioner's ear, and petitioner and Regina went into the bedroom and shut the door. *Id.* One of the gang members suggested that they rob petitioner and, to Roland's surprise, Melvin, Filadelfo, and Teodulo agreed. *Id.* at 38. Roland commented that he thought petitioner was their friend, but Melvin, Filadelfo, and Teodulo indicated that they only dealt with petitioner on a business level and had thought about robbing him for some time. *Id.* According to Roland, when petitioner took his phone and tried to leave, the gang members surrounded him, beat him, and talked about killing him. *Id.* During this altercation, Fabiana retrieved a gun from another room and gave it to Melvin. *Id.*

When they heard police sirens, "Melvin quickly reminded everyone of an incident they had all been a part of a few days prior and to just switch the name for [petitioner's] name." *Id.* Roland asserts that he left the apartment after noticing that Lisa was no longer there, and he later found out that Lisa was the person who had contacted the police. *Id.* Roland met some MS-13 gang members later who bragged about robbing petitioner and who were still using petitioner's cellphone. *Id.* The gang members allegedly told Roland that they tried to move to avoid going to court, but that the "Commonwealth Attorney was down on them hard so they had to go." *Id.* According to Roland, they created a story and lied in court. *Id.* at 39. Roland explained that he prepared the affidavit because, "I have changed my life and I cannot in good conscience allow an innocent man to do time for a crime he did not commit." *Id.*

To bolster Roland's affidavit, petitioner offers a February 2004 Cingular Wireless bill. Pet. Ex. D, ECF No. 1 at 42–62.  Petitioner indicates that he does not recognize numerous telephone numbers that appear on the Cingular Wireless bill, and has circled or otherwise indicated the numbers he does recognize on the exhibit. Pet. 36, 42–66, Pet. Ex. D.  Petitioner submits the cellphone bill in support of his claim that he was intentionally framed, and argues that the cellphone bill demonstrates that one of the alleged victims stole and used petitioner's phone.  Pet. 24, 36.  The Court questions the reliability and significance of this evidence that consists entirely of petitioner's notation, on a 12 year old cellphone bill,[2] of certain telephone numbers that he does and does not recognize.

Further, a cursory review of the cellphone bill indicates that it does not support the allegations in Roland's affidavit.  According to Roland, petitioner arrived at the North Second Road apartment around 12:30 a.m. on January 13, 2004.  Pet. 37.  Several hours later, the MS-13 gang members robbed petitioner, taking his phone, and the gang members continued to use the phone for days afterwards.  Pet. 38.  The bill's call records, however, do not support this timeline.  For example, petitioner indicates that the number (703) ***-0903 belongs to one of his friends, Pet. 66, and the bill reflects that petitioner called this number on January 12, 2004.  Pet. 49.  Following petitioner's arrest, however, calls were also made to petitioner's friend at the (703) ***-0903 number on January 17, 18, and 23, 2004, and a call was received from that number on January 18, 2004.  Pet. 52, 55.  Petitioner offers no explanation for why the MS-13 gang members would have attempted to contact his friend on multiple occasions, or why his friend would have returned their call.  Similarly, petitioner identifies the number (703) ***-5455

---

[2] The bill in question contains call records for two, separate telephone numbers in petitioner's name.  The bill attached to the petition, however, is incomplete, as it fails to contain pages 7, 8, 23, 24, and 25 of the bill and contains no call records after January 9, 2014 for the second telephone number.  Pet. 1, 3, 22.

as belonging to a friend. Pet. 66. A 12 minute call, however, was made from petitioner's phone to that number on the evening of January 14, 2004. Pet. 50. Moreover, multiple calls were made to and received from that number daily from January 15–23, 2004. Pet. 51–55. Accordingly, petitioner's cellphone bill does not provide support for Roland's affidavit or petitioner's claim that he was robbed and framed.

Roland's affidavit and the cellphone bill are insufficient to make a credible showing of actual innocence. First, the affidavit is not reliable. Although the affidavit is signed under the penalty of perjury in the presence of a notary public, the fact that Roland is an inmate at the same correctional facility as petitioner "'call[s] into question' the affidavit's reliability.'" *Fentress v. Clarke*, No. 1:15cv965, 2016 WL 4118916, at \*4 (E.D. Va. July 28, 2016) (quoting *Milton v. Sec'y, Dep't of Corr.*, 347 F. App'x 528, 531 (11th Cir. 2009)). That petitioner and Roland are incarcerated in the same correctional institution over ten years after the trial, and Roland has only now decided to tell the truth about what happened seems an unlikely coincidence. Conveniently, Roland does not implicate himself in the beating and robbery of petitioner.

Second, petitioner's delay in submitting this affidavit is troubling. Although an "unjustifiable delay on a habeas petitioner's part" does not constitute "an absolute barrier to relief," timing is a factor that the Court should consider "in determining whether actual innocence has been reliably shown." *McQuiggin*, 133 S. Ct. at 1928. Here, the sworn affidavit was completed on August 26, 2014, ten years after petitioner's trial. Pet. Ex. A at 39. Moreover, the petition was submitted to the Court on January 12, 2016, nearly 18 months after the completion of the affidavit. It is reasonable to assume that once a wrongly convicted individual discovered possible new exculpatory evidence, that individual would seek to submit the evidence to the Court in a speedy fashion. Both the delay in obtaining and submitting the affidavit cause the Court to discount the reliability of the evidence.

Third, the version of events presented in Roland's affidavit was, in most part, presented to the jury during counsel's opening statement. Having heard all the evidence, including the testimony of defense witness Jorge Pinto, however, the jury rejected this version of events and found the evidence presented during the trial proved petitioner's guilt beyond a reasonable doubt.

Fourth, considering the evidence presented at trial along with the cellphone bill and Roland's affidavit, petitioner has failed to show that "it is more likely than not that no reasonable juror would have convicted" him. *Schlup*, 513 U.S. at 327. As discussed above, petitioner's claim that he does not recognize certain phone numbers listed on his cellphone bill is not persuasive evidence that he was framed, and the call log provided in the bill does not support petitioner's claim that MS-13 gang members were using the phone. Further, the Roland affidavit conflicts with the testimony and the physical evidence presented at trial, and fails to provide a plausible explanation for the situation that police officers encountered upon responding to the apartment. The affidavit directly contradicts the testimony of the four victims. *See Hazel v. United States*, 303 F. Supp.2d 753 (E.D. Va. 2004) (noting "a rational jury might well not credit the affidavit" offered in support of petitioner's actual innocence claim where the affidavit directly contradicts the testimony of four witnesses). If Roland's account of the evening is to be believed, the victims needed to coordinate the details of their story prior to giving statements. However, Officer Gonser testified that the victims were not communicating with each other at the apartment, during their transfer, or after they were separated into rooms to give statements. Roland's explanation that the victims were recounting an "incident they had been a part of a few days earlier" is similarly unconvincing. Petitioner has not provided a plausible explanation for the victims' testimony.

14

The officers responding to the apartment described the victims as frightened, frantic, scared, and in shock. The officers testified that there was no smell of marijuana in the apartment, and that the victims all appeared to be wearing pajamas. Moreover, the physical evidence gathered at the scene matched the version of events offered by the victims at trial. This includes the $40.00 and cellphone (containing Spanish words) found in petitioner's pocket, the used condom rubber banded inside his pants leg, the gun and bandana recovered from the bedroom, and the female panties recovered from under the sofa.

The evidence presented at trial consisted of the testimony of Regina, Melvin, Fabiana, and Filadelfo, four of the five residents and victims of petitioner's crimes; Officers Roesler, Ordonez, and Gonser of the Arlington County police force who responded to the apartment the night of the incident; Officer Taber, who transported petitioner the night of the incident; Kelly Ledbetter, a forensic scientist for the Commonwealth of Virginia; Diane Burkhart, the sexual assault nurse examiner; four other employees of the Arlington County Police Department; and Jorge Pinto, petitioner's high school friend. Based on the testimony, the jury convicted petitioner of one count of breaking and entering, two counts of robbery, three counts of attempted robbery, one count of rape, and five counts of using a firearm in the commission of a felony. Weighing Roland's affidavit and petitioner's cellphone exhibit along with the evidence presented at trial, the Court cannot find that "no reasonable juror would have convicted [the petitioner]." *Schlup*, 513 U.S. at 327. Because petitioner's evidence is not reliable and would not prevent a reasonable juror from finding petitioner guilty, his claim of actual innocence cannot excuse his failure to comply with the federal statute of limitations.

## C.   Evidentiary Hearing

In petitioner's opposition to respondent's motion to dismiss, he requests an evidentiary hearing. Opp. to Mot. to Dismiss at 6.  The Court "may grant an evidentiary hearing in a § 2254 case only where the petitioner has 'allege[d] additional facts that, if true, would entitle him to relief and has 'establish[ed] one of the six factors set forth in *Townsend v. Sain,* 372 U.S. 293 (1963).'"[3]  *Robinson v. Polk,* 438 F.3d 350, 368 (4th Cir. 2006) (quoting *Fullwood v. Lee,* 290 F.3d 663, 681 (4th Cir. 2002)).  As discussed above, petitioner has failed to allege additional facts that would entitle him to relief.  Accordingly, petitioner's request for an evidentiary hearing is **DENIED** because a hearing would not aid in the decisional process.

## IV.   RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that respondent's motion to dismiss, ECF No. 8, be **GRANTED**, and the petition for a writ of habeas corpus, ECF No. 1, be **DENIED.**

## V.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that, pursuant to 28 U.S.C. § 636(b)(1)(C):

1.       Any party may serve upon the other party and file with the Clerk written objections to the foregoing report and recommendation within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant

---

[3] Those six factors are:   (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  *Townsend,* 372 U.S. at 313.

to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely objections to the report and recommendation will result in waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
**United States Magistrate Judge**

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
October 17, 2016